STATE EX REL. WICKENS, PROSECUTOR, *v.* CLARK.
[No. 26,346.   Filed June 11, 1935.]

*Davidson & Rolfes* and *Hubert E. Wickens,* for appellant.

*Tremain & Turner,* for appellee.

TREANOR, C. J.—Appellant relator brought an action

in the form of an information under §3-2001,[1] Burns Ind. St. Ann. 1933, §1045, Baldwin's 1934 (Acts 1881 [Spec. Sess.], ch. 38, §814, p. 240; Acts 1929, ch. 221, §2, p. 806), against Anson B. Clark, appellee, alleging that Clark "was appointed superintendent of the county asylum" of Decatur county; that "he took possession of said office and has ever since held and exercised said office without any authority or right other than said appointment," and that "at the time of said appointment he was not an elector of said county and had not been an inhabitant thereof for one year preceding said appointment, as provided by the Constitution of the State of Indiana."

A demurrer was filed to the information on the ground that it did not state facts sufficient to constitute a cause of action, and the trial court sustained the demurrer. Relator refused to plead further and judgment was rendered against him. The sustaining of the demurrer is the sole error assigned on this appeal.

Appellee, defendant below, contends that the action of the trial court in sustaining the demurrer was correct; that the information filed by relator was insufficient (1) because "it fails to set out the name of the person entitled to said office" in compliance with §3-2005, Burns, etc., 1933, §1048, Baldwin's 1934,[2] and (2) because the superintendent of the county asylum, whose appointment is provided for by §52-204, Burns, etc.,

Note 1. "An information may be filed against any person or corporation in the following cases:

[1] "When any person shall usurp, intrude into, or unlawfully hold or exercise any public office or any franchise within this state, or any office in any corporation created by the authority of this state. . . ."

[2] "Whenever an information shall be filed against a person for usurping an office by the prosecuting attorney, he shall also set forth therein the name of the person rightfully entitled to the office, with an averment of his right thereto; . . ." Acts 1881 (Spec. Sess.) ch. 38, §817.

1933, §13365, Baldwin's 1934,[3] is not a "county officer" within the meaning of §§3[4] and 4,[5] article VI, of the Indiana Constitution, and consequently it is not necessary for such superintendent either to be an elector of the county at the time of his appointment or to have been an inhabitant of the county "during one year prior" to the time of such appointment.

We shall first consider appellee's contention that the superintendent of the county asylum is not a county officer within the meaning of §§3 and 4, art. VI, of the Indiana Constitution.

The establishment of county asylums for the poor was authorized by §3, art. IX, of the Indiana Constitution, which reads as follows:

"The county boards shall have power to provide

[3] "It shall be the duty of the board of county commissioners in each county in Indiana, on the first Monday of January, 1914, to appoint a superintendent of the county asylum, who will serve for four (4) years from the first day of March next ensuing, unless sooner removed for cause, as prescribed in a subsequent section of this act; . . . Each superintendent appointed according to the terms of this act shall receive such annual salary, in addition to quarters and board for himself and family, in the county asylum, as shall be fixed by the said board of county commissioners: . . . In appointing a superintendent of the poor asylum, the commissioners shall select a reputable citizen of good moral character, kind and humane disposition, good executive ability, who has had a good common school education and is a skilled and experienced farmer. No consideration other than character, competence and fitness shall be allowed to actuate the commissioners in selecting, continuing or discharging any superintendent or other officer. No relative of any member of the board of county commissioners shall be appointed superintendent or employed in any capacity, and no relative of the superintendent, except his wife as matron, shall be employed in any capacity with such asylum except by the consent of the board of county commissioners." Acts 1899, ch. 76, §1, p. 103; Acts 1913, ch. 360, §1, p. 961.

[4] "Such other county and township officers as may be necessary, shall be elected, or appointed, in such manner as may be prescribed by law."

[5] "No person shall be elected, or appointed, as a county officer, who shall not be an elector of the county; nor any one who shall not have been an inhabitant thereof, during one year next preceding his appointment, if the county shall have been so long organized; . . ."

farms as an asylum for those persons who, by reason of age, infirmity, or other misfortune, have claims upon the sympathies and aid of society."

The General Assembly of 1852 gave effect to the foregoing constitutional provision by enacting the following statute:

"It shall be lawful for the board of county commissioners of any county in this state, whenever it may deem it advisable, to purchase a tract of land in the name of such county, and thereon to build, establish and organize an asylum for the poor, and to employ some humane and responsible person, resident in such county, to take charge of the same, upon such terms and under such restrictions as the board shall consider most advantageous for the interests of the county, who shall be called the 'superintendent of the county asylum.' . . ." §52-201, Burns, etc., 1933, §13360, Baldwin's 1934, 1 R. S. 1852, ch. 81, §25, p. 401.

The bond of such superintendent was fixed at $500.00. The superintendent was required semi-annually to make a "detailed report in writing" concerning each pauper admitted and the board of county commissioners was required to make an annual inspection of the asylum. In 1899, by an act repealing all laws or parts of laws in conflict, the General Assembly provided that the board of county commissioners should "appoint a superintendent of the county asylum who shall serve for two years"; that "in appointing a superintendent of the poor asylum the commissioners shall select a reputable citizen of good moral character, kind and humane disposition, good executive ability, who has had a good common school education and is a skilled and experienced farmer," and that "no considerations other than character, competence and fitness shall be allowed to actuate the commissioners in selecting, continuing or discharging any superintendent or other officer." The board of commissioners was authorized to remove such superin-

tendent for cause. The requirement of the act of 1852 that the person employed as superintendent be a resident of the county, was omitted from the 1899 act. Other sections of the act fixed the duties of the board of commissioners[6] and of the superintendent,[7] and made

[6] "The board of county commissioners of each county shall prescribe such rules and regulations as may, in their judgment be necessary for the management of the asylum for the poor. With the advice and assistance of the superintendent of the county poor asylum they shall regulate the number and fix the compensation of such matrons, assistants, nurses, attendants, farmers, seamstresses, laborers, or other employes as may be needed for the care and control of the asylum. They may remove the superintendent from office, at any time, but only for cause, which cause shall be entered in the record book of the Commissioners' Court. . . ." §2, ch. 76, Acts 1899, p. 103; §52-206, Burns, etc., 1933; §13366, Baldwin's 1934.

In addition to the foregoing, the board of county commissioners shall inspect estimates for supplies and materials, may make amendments thereto, shall receive, open and reject bids, or award contracts, therefor, pursuant to notice; shall examine, approve and allow bills therefor and order the issuance of warrants, and may order the sale of surplus farm products and receive reports of such sales.

[7] "The superintendent shall appoint such matrons, assistants, nurses, farmers, laborers or other employes as shall be needed for the work of the asylum. The superintendent may remove and dismiss any officer or employee whom he shall have appointed at any time, which removal he shall report in writing to the board of county commissioners at their next regular meeting. It shall be his duty to promptly remove any officer or employee who shall be guilty of drunkenness, profane or abusive language in the presence of inmates, cruelty to the inmates, lewdness or any other offense against the laws of Indiana or against public decency. No political, family or other improper influence shall be allowed to actuate the superintendent in appointing or dismissing any subordinate officer or employe, but considerations of character, merit and competence shall be the sole and only reason for any such appointment or dismissal." §3, ch. 76, p. 103, Acts 1899; §52-207, Burns, etc., 1933; §13369, Baldwins' 1934.

By other sections of the act it is made the duty of the superintendent to "manage the asylum and its farm to the best interests of the county," to "maintain order and discipline, . . . assign a reasonable amount of labor to every inmate who is able to perform the same," dismiss inmates who, without cause, refuse to perform labor assigned to them; to carefully observe the rules and regulations prescribed by the county commissioners, be guided by the suggestions which may be made by the board of state charities and corrections; to make reports to the board of commissioners as they may order and make such reports to the board of state charities as shall be required by them. On specified days, four times per year, the superintendent shall file

provision for the purchase of supplies of food and material for the use of the asylum and farm. In 1913 the General Assembly, by amendment of certain provisions of the act of 1889, increased the term of such superintendent from two to four years, authorized an appeal by the superintendent to circuit court from an action of the board of commissioners dismissing him, required the board of commissioners to make an inspection of the asylum every three months and required the county council to appropriate and the commissioners to allow for the necessary help and equipment for the asylum, and tools, implements, livestock, etc., for the farm.

An examination of the duties imposed by statute upon the board of county commissioners clearly indicates that the General Assembly intended to define and make effective the constitutionally conferred power of such boards, and to provide a proper and uniform method of exercising such power. The board of county commissioners retains supervision and control over the county poor asylum and county farm and is authorized to appoint a superintendent as the agent of the board in the management of such asylum and farm. In providing for, and in exercising supervision and control over, an asylum and farm, and in appointing a superintendent therefor, the board of county commissioners performs a county governmental function and acts as an official board. But an examination of the duties imposed by statute upon the superin-

with the county auditor an estimate of the supplies of food, fuel, clothing and material for the inmates and asylum; he shall examine bills and if correct, certify that the supplies were received and were of proper quality. Upon order, and under the direction of the county commissioners, he may purchase live stock, implements, and other farming supplies as shall be needed upon the county farm and shall certify as to the correctness of all claims therefor; he shall report surplus produce to the county commissioners and, upon their order, sell the same, reporting such sales, in detail, to the board of county commissioners.

tendent of the county asylum indicates that he is not an "officer" of the county, but is an employee of the county, appointed and controlled by the board of commissioners, though entitled to certain privileges as respects term of employment and hearing and appeal in case of removal. While he is required to execute a bond, he takes no oath of office,[8] nor does he exercise any of the sovereign power of the state.[9] The superintendent is the general manager of the asylum and county farm under terms fixed by the board of county commissioners, and in the performance of his duties he is always subject to the control of the board. The superintendent is the executive agent of the board of commissioners, whom the board, under legislative authority, has employed to perform certain services which must be performed to enable the board of commissioners fully to discharge its duties as the official governmental power

[8] "The duty to take an oath of office is a strong circumstance in distinguishing between an officer and an employee, and there are a number of cases where such circumstance is considered with other circumstances in determining the character of the position in question." 17 Am. & Eng. Ann. Cas. 449, 456, and cases there cited; Ann. Cas. 1917D, 316, 322 and cases there cited.

"The officer is distinguished from the employee in the greater importance, dignity, and independence of his position; in being required to take an official oath, and perhaps to give an official bond; in the liability to be called to account as a public offender for misfeasance or nonfeasance in office; and usually, though not necessarily, in the tenure of his position." *People* v. *Langdon*, (1879), 40 Mich. 673.

See also *State ex rel. Newman* v. *Skinner* (1934), 128 Oh. St. 325, 191 N. E. 127, 93 A. L. R. 331, and annotation beginning on 333; *State ex rel. Barney* v. *Hawkins* (1927), 79 Mont. 506, 257 Pac. 411, 53 A. L. R. 583, and annotation beginning on 595.

[9] "It may be stated as a general rule, fairly deducible from the cases discussing the question, that a position is a public office when it is created by law, with duties cast upon the incumbent which involve an exercise of some portion of the sovereign power and in the performance of which the public is concerned, and which also are continuing in their nature and not occasional or intermittent; while a public employment, on the other hand, is a position which lacks one or more of the foregoing elements." 17 Am. & Eng. Cas. 449, 452; Ann. Cas. 1917D, 316, 319. See also *State ex rel. Newman* v. *Skinner, supra*, and *State ex rel. Barney* v. *Hawkins, supra*.

of the county.[10] In our opinion the superintendent of the county asylum is not a county officer within the meaning of §§3 and 4, art. VI, of the Indiana Constitution.

Appellant cites the case of *Lake County* v. *Neuenfeldt* (1922), 78 Ind. App. 566, 136 N. E. 580, as holding that the superintendent of the county asylum is a county officer. A correct result was reached in that case, but insofar as the reasoning rests upon the assumption that the superintendent of the county asylum is a county officer it is hereby modified.

Inasmuch as we hold that the superintendent of the county asylum is not a county officer within the meaning of §§3 and 4, art. VI, of the Indiana Constitution, the information is insufficient on its merits and it is not necessary to decide whether it is formally defective by reason of the failure to include therein the name of the person entitled to the position of superintendent of the county asylum.

Judgment affirmed.

Tremain, J., not participating.

---

[10] Compare *Kostanzer* v. *State ex rel. Ramsey* (1933), 205 Ind. 536, 187 N. E. 337: "Officers of municipal corporations, school or civil, exercise the governmental powers of their respective corporations; and school boards or trustees of school townships as officers of school corporations and in the exercise of governmental powers employ teachers to perform certain services for the corporations. But in performing these services teachers do not represent the state or municipal corporations or in any sense exercise governmental powers. Consequently we conclude that the position of a teacher is an employment and not an office."

See discussion in *State ex rel. Coffing* v. *Abolt et al., Board of County Commissioners* (1934), 206 Ind. 218, 189 N. E. 131.